Filed 5/10/21  P. v. Diaz CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E072522 |
| v. | (Super.Ct.No. INF1100710) |
| ADAN OROZCO DIAZ, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County. James S. Hawkins, Judge. (Retired Judge of the Riverside Sup. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.) Affirmed.

Martin Kassman, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Michael Pulos and Kathryn Kirschbaum, Deputy Attorneys General, for Plaintiff and Respondent.

1

# I. INTRODUCTION

On April 9, 2011, 18-month-old Jane Doe arrived at the hospital with her mother, M.A., and her mother's boyfriend, Adan Diaz (defendant). When she arrived, Jane Doe's heart had stopped, she had stopped breathing, and she was blue from lack of oxygen. She had bruises on her arms, legs, face, and back; a tear in her upper lip; abrasions to her nipples; and a burn on her arm. Medical professionals also determined she was suffering from bleeding in her brain, and they had to perform a craniotomy to relieve swelling.

As a result of the injuries suffered by Jane Doe, defendant was convicted by a jury of one count of felony child abuse. (Pen. Code,[1] § 273a, subd. (a), count 1.) Additionally, the jury found true allegations that defendant personally inflicted great bodily injury in the commission of count 1. (§§ 12022.7, subd. (d), 1192.7, subd. (c)(8).) He was sentenced to nine years in state prison, representing the midterm of four years on count 1 and an additional five years for the great bodily injury enhancement.

Defendant appeals, arguing the trial court erred in admitting evidence of three text messages he sent prior to returning home to Jane Doe on the date of the incident. Specifically, defendant claims this evidence was more prejudicial than probative and should have been excluded under Evidence Code section 352. We disagree and affirm the judgment.

---

[1] Undesignated statutory references are to the Penal Code.

## II.  FACTS AND PROCEDURAL HISTORY

A. *Facts and Charges*

On the evening of April 9, 2011, Riverside County Sheriff's Department deputies were dispatched to the hospital in response to a report of a child who had arrived lifeless. Jane Doe was transported to the hospital by defendant and M.A.  When she arrived at the hospital shortly after 9:00 p.m., her heart had stopped, she had stopped breathing, and she was blue from lack of oxygen.  She had bruises on her arms and legs, consistent with being slapped or grabbed; bruises on her face and back; a burn on her arm; a tear in her upper lip consistent with an object being shoved into her mouth; and abrasions to her nipples consistent with being pinched.  Additionally, medical professionals determined she was suffering from bleeding in her brain, and they performed a craniotomy to relieve swelling.

As a result of the injuries to Jane Doe, defendant was charged with one count of felony child abuse (§ 273a, subd. (a)) with an allegation that he personally inflicted great bodily injury in the commission of the offense.

B. *Summary of Relevant Evidence at Trial*

1. Testimony of M.A.

M.A. testified that in April 2011 she was in a dating relationship with defendant and lived with him in a rented casita along with Jane Doe.  M.A. initially testified that on April 9, she was scheduled to work between the hours of 4:00 and 10:00 p.m.  Jane Doe's babysitter abruptly canceled that day, and M.A. called defendant to come home from work so that he could watch Jane Doe.  After defendant arrived home, she went to work

and left Jane Doe in defendant's care. At the time, she did not observe anything wrong with Jane Doe, and she did not believe Jane Doe was suffering from any medical conditions of concern.

While at work, she received several text messages from her landlord expressing concern for Jane Doe. As a result, M.A. rushed home during her break to check on Jane Doe, but she did not see anything of concern or any bruises at the time. She went back to work but received numerous text messages and calls from defendant, stating Jane Doe would not stop crying and that she needed to come home. At some point, defendant called her workplace to speak with her and told her that Jane Doe had stopped breathing; M.A. asked him to immediately bring Jane Doe to her workplace. When they arrived, M.A. described Jane Doe as limp, with her head tilted to the side and her eyes rolled back into her head. M.A. climbed into the defendant's vehicle, began trying to administer CPR to Jane Doe, and told defendant to drive to the hospital. She could not recall whether Jane Doe hit her head on the car while she was attempting to get her out of the car and into the hospital, but M.A. admitted she had previously told law enforcement that had occurred.

Following a break in the proceedings, M.A. admitted to lying during her initial testimony. M.A. then testified she had left Jane Doe at home alone strapped into a car seat in order to get to work. She explained that defendant was supposed to go home and watch Jane Doe, but she also admitted that around 5:50 p.m., she engaged in a text message exchange with defendant wherein he stated he had gone out and she pleaded with him to go home to Jane Doe. M.A. stated that following this exchange, she believed

4

defendant had gone home to watch Jane Doe. She recalled that defendant stopped by her workplace at some point that evening to pick up food. She believed Jane Doe was with defendant, and that she fed Jane Doe some food at the time but was "not 100 percent." At some point later that evening, she received text messages from defendant stating Jane Doe had been crying; he had pushed her; and Jane Doe had hit her head.

On cross-examination, M.A. admitted she previously told investigators that Jane Doe's bruises, abrasions, and burn were from other accidents and incidents that occurred prior to April 9, 2011. Defendant also elicited testimony from M.A. that she had previously told investigators defendant was good at soothing and caring for Jane Doe.

2. Defendant's Prior Statements to Investigators

The first sheriff's deputy to arrive at the hospital on April 9, 2011, spoke with defendant and M.A. With M.A. present, defendant told the deputy that he had gone to pick up food from M.A.'s workplace while his brother stayed home with Jane Doe. Defendant stated that when he returned home, Jane Doe was sleeping, everything appeared fine, and that his brother then left. However, when he tried to wake Jane Doe to feed her, she did not seem like she wanted to wake up and would not stand. He "started to give her breaths in her mouth" and called M.A.

Once a second sheriff's deputy arrived at the hospital, defendant and M.A. were interviewed separately. Defendant told the second deputy that he, M.A., Jane Doe, and his brother were at their home in the afternoon of April 9, 2011; M.A. left for work around 4:00 p.m.; he left for his second shift at work around 5:20; and his brother remained home to help babysit Jane Doe. Defendant stated it was slow at work that

5

evening, and he obtained permission to leave early around 7:45; he stopped to pick up food from M.A.'s workplace around 8:40; and he then returned home. When he returned home, Jane Doe was sleeping in a car seat, his brother told him everything was fine, and his brother left. However, when defendant tried to wake Jane Doe up to feed her, she did not wake up, and he discovered that she had stopped breathing and was limp and nonresponsive. He called M.A., took Jane Doe with him to pick up M.A. from work, and then drove to the hospital.

Defendant subsequently agreed to another interview with investigators from the sheriff's department.[2] During this third exchange, defendant initially recounted the same general sequence of events he previously told deputies at the hospital. He also recalled that Jane Doe hit her head on the car door as M.A. attempted to carry her out of the car into the hospital.

However, when pressed by investigators, defendant began to provide additional details. When asked if his landlord came to check on him at some point during the day, he recalled that after M.A. left for work, he had to give Jane Doe a shower because she had "pooped" on herself, and he was interrupted by his landlord while doing so. He also recalled that his landlord called M.A. following this incident, M.A. insisted on coming home to check on Jane Doe, and that M.A. went back to work after ensuring Jane Doe was fine. When asked about Jane Doe's various injuries, he claimed that Jane Doe

---

**2** Defendant's interview with investigators was recorded, and the recording was played for the jury.

already had bruises, abrasions, and a burn from various accidents and incidents prior to April 9, 2011.

Upon further questioning, defendant stated he left early from his second shift at work around 7:45 that evening, drove directly to M.A.'s workplace to pick up food, waited with M.A. for a period of time because the food was not ready when he arrived, and did not get home until around 8:40 p.m. He continued to maintain that his brother was at home with Jane Doe until he returned from his second shift at work. When he arrived home, Jane Doe was sleeping in her car seat and his brother left. When he woke Jane Doe up at approximately 8:50 p.m., Jane Doe became fussy, he pushed Jane Doe out of frustration, and Jane Doe fell back and hit her head on a chair.

3. Testimony of Defendant's Landlord

Defendant's landlord testified that on April 9, 2011, around 4:00 p.m., she heard noises and Jane Doe screaming from defendant's casita. She went and knocked on the casita door and, eventually, defendant partially opened it, showing only his face. When she asked defendant whether he was hitting Jane Doe, defendant denied it and claimed Jane Doe was currently in the shower with M.A. Since she did not actually see M.A., she text messaged M.A. to verify M.A. was at home with Jane Doe. When M.A. responded stating she was at work, the landlord called M.A. and told her what she had heard and seen. M.A. told her she would return to the casita to check on Jane Doe, and the landlord did not hear any noise from the casita thereafter.

4. Testimony of Defendant's Brother

Defendant's brother testified that on April 9, 2011, defendant contacted him about 4:00 p.m. and asked him to babysit Jane Doe. However, he declined because he already had other plans for that night. About 4:00 o'clock the following morning, he received a text message from defendant asking him to represent that he had been with defendant, if anyone were to ask. Defendant's brother also recalled that on April 11, he was present when his mother received a call from M.A., wherein M.A. asked defendant's mother to have defendant's brother falsely claim that he had dropped Jane Doe while watching her.

5. Defendant's Phone Logs and Text Messages

A sergeant with the Riverside County Sheriff's Department testified that he was currently assigned to the department's computer and technology crime high-tech response team; had been trained in computer forensics; and had been part of the team for at least 10 years. The sergeant testified that he performed a forensic extraction of the text messages from defendant's phone for the relevant time period. The extraction revealed that defendant placed several calls to M.A. between 5:42 and 5:48 p.m. At 5:50 p.m., he sent a text message to M.A. that stated: "Babe, go home. Better if [that] bitch finds out. We left her alone, she would probably . . . call the cops. Just go home is better just for today."[3] He then called M.A.'s workplace at 5:52 p.m.

---

[3] M.A. testified that she understood defendant to be referring to her landlord finding out they had left Jane Doe home alone. M.A. also testified that following this text message, they engaged in a text message exchange in which each told the other they needed to go home from work to watch Jane Doe.

Over defendant's objection, the trial court admitted three text messages sent by defendant to someone other than M.A. The first text message was sent at 7:32 p.m. and stated: "What are you doing? I'm off work. Let's chill"; the second was sent at 7:47 p.m. and stated: "Okay. Just go outside really fast. I'm almost there. I'll text you when I'm outside"; and the third was sent at 8:01 p.m. and stated: "Oh, cool. I'm just going home. Want to chill?"

Defendant's phone logs further revealed he placed several calls to both M.A.'s personal cellphone and her work telephone, with the last call being around 8:56 p.m. At approximately 9:20 a.m., on April 10, 2011, defendant sent a text message to a third person that stated: "I fucked up. I'm going to jail." He also sent a text message to M.A. at 9:21 a.m. that stated: "I fucked up. I think I'm going to jail." He then followed up with another text message to M.A. that stated: "What, babe? She was crying a lot, and I pushed her, but I didn't mean for her to hit her head." He followed up with another text message to M.A. that stated: "I'm sorry. I'm going to jail. [Jane Doe] is going to be okay. Babe, I promise I told the cops that [defendant's brother] watched her; so keep the story the same."

C. *Verdict and Sentence*

Defendant was convicted by a jury of one count of felony child abuse. (§ 273a, subd. (a).) Additionally, the jury found true allegations that he personally inflicted great bodily injury in the commission of count 1. (§§ 12022.7, subd. (d), 1192.7, subd. (c)(8).) Defendant was sentenced to nine years in state prison, representing the midterm of four years on count 1, and an additional five years for the great bodily injury enhancement.

9

## III.  DISCUSSION

The sole claim defendant raises on appeal is that the trial court erred in admitting three text messages over his objection pursuant to Evidence Code section 352:  (1) The text message sent at 7:32 p.m., stating:  "What are you doing?  I'm off work.  Let's chill";  (2) The text message sent at 7:47 p.m., stating:  "Okay. Just go outside really fast.  I'm almost there.  I'll text you when I'm outside"; and (3) the text message sent at 8:01 p.m., stating:  "Oh, cool.  I'm just going home.  Want to chill?"  We find no error in the admission of these text messages and decline to reverse the judgment on this basis.

A.  *General Legal Principles and Standard of Review*

"The principles governing the admission of evidence are well settled.  Only relevant evidence is admissible [citation], 'and all relevant evidence is admissible unless excluded under the federal or California Constitution or by statute.' " (*People v. Harris* (2005) 37 Cal.4th 310, 337.)  Under Evidence Code section 352, "[a] trial court may exclude otherwise relevant evidence when its probative value is substantially outweighed by concerns of undue prejudice, confusion, or consumption of time." (*People v. Scott* (2011) 52 Cal.4th 452, 490 (*Scott*).)

"We review for abuse of discretion rulings by the trial court on the admissibility of evidence, including rulings that turn on the relative probativeness and prejudice of the evidence in question.  [Citation.]  ' "Evidence is substantially more prejudicial than probative [under Evidence Code section 352] if, broadly stated, it poses an intolerable 'risk to the fairness of the proceedings or the reliability of the outcome' [citation]." . . . "The admission of relevant evidence will not offend due process unless the evidence is so

10

prejudicial as to render the defendant's trial fundamentally unfair." ' " (*People v. Hamilton* (2009) 45 Cal.4th 863, 930.)

B. *Evidence Was Relevant*

Initially, we agree with the trial court's determination that the challenged text messages were relevant. "Relevant evidence . . . [is] evidence ' "having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action," ' [and] tends ' "logically, naturally, and by reasonable inference" to establish material facts such as identity, intent, or motive.' " (*People v. Crittenden* (1994) 9 Cal.4th 83, 132.) Further, the fact that a defendant does not expressly contest an issue does not render evidence of that issue irrelevant. (*Ibid.* [fact that defendant did not contest testimony of medical examiner does not render photographs taken by examiner irrelevant].) "The trial court has broad latitude in determining the relevance of evidence." (*Scott*, *supra*, 52 Cal.4th at p. 490.)

Here, the challenged text messages were relevant for at least three, independent reasons. First, as the trial court correctly concluded, evidence of the timeline of events leading up to a crime is generally relevant. " 'As a rule, the prosecution in a criminal case involving charges of murder or other violent crimes is entitled to present evidence of the circumstances attending them even if it is grim.' [Citation.] [Such evidence is] not rendered 'irrelevant or inadmissible simply because [it] duplicate[s] testimony, depict[s] uncontested facts, or trigger[s] an offer to stipulate.' " (*People v. Thomas* (2012) 53 Cal.4th 771, 806.)

11

In this case, the jury was presented with at least five different versions of the events that occurred on April 9, 2011—at least two from M.A. testifying on the stand and three from defendant's various prior statements to law enforcement. Thus, the trial court concluded that the timeline was very relevant to the case. Indeed, when making his objection below, defense counsel conceded the timeline was relevant.[4] Since the text messages had some tendency to establish the times that defendant may have been home with Jane Doe the evening of her injuries, we agree with the trial court's conclusion that the evidence was relevant to establish a timeline of events.

Second, the trial court correctly concluded that the text messages were relevant to clarify ambiguities in M.A.'s prior testimony. In at least one version of events offered by M.A., she testified that when defendant arrived to pick up food at her place of work, Jane Doe was with him, and that M.A. fed Jane Doe at that time. The trial court specifically referred to this ambiguity during argument on defendant's objections, stating: "[The text message] pinpoints where [defendant] was at the time when he left work early, and he was coming home . . . . And apparently, there is evidence that instead of coming home, he went and got some pizza or cheese bread *and either the child was with him or it wasn't*, and apparently he was doing other things rather than going home. That's the relevance I saw." As the trial court correctly noted, whether Jane Doe was with

---

**4** While conceding that evidence of a timeline was relevant, defense counsel sought to argue that the content and recipients of the text messages were not relevant. However, we note the content of the messages are what permit the jury to infer defendant was not at home at the time he sent the messages. Thus, it was both the existence and the content of the text messages that gave the text messages evidentiary value with respect to establishing a timeline.

defendant at the time he picked up food from M.A.'s workplace was unclear, and the text messages were relevant to clarify that ambiguity.

Clarifying this ambiguity in the testimony was unquestionably relevant to an essential issue in this case. Felony child abuse requires the prosecution to establish the defendant willfully caused physical injury. (§ 273a, subd. (a).) Jane Doe presented to the hospital with multiple injuries, including trauma to her head, bruises, abrasions, and a burn. While defendant admitted pushing Jane Doe one time causing her to hit her head, defendant claimed it was an accident and denied causing any of her other injuries. The prosecution was entitled to make a case that defendant caused all of the injuries, as such would create a stronger inference that defendant's acts were not accidental but willful. Part of this showing necessarily included showing that defendant had the opportunity to inflict multiple injuries. The question of whether Jane Doe accompanied defendant to pick up food from M.A. was therefore relevant because, if Jane Doe had been present, and M.A. had fed Jane Doe at that time, it would significantly reduce the window of time in which defendant could have potentially inflicted injury on Jane Doe.[5] We therefore agree that the text messages were probative because they could assist in resolving whether Jane Doe was with defendant when he visited M.A.'s workplace in the evening. Resolution of that issue was relevant to show defendant had the opportunity to inflict multiple injuries on Jane Doe.

---

[5] In at least some versions of the events of April 9, 2011, M.A. last saw Jane Doe during her break in the afternoon, allowing for the inference that defendant could have inflicted some injuries in the afternoon, as well as additional injuries in the evening, upon his return home from his second shift at work.

Third, the trial court correctly concluded that even if the text messages might suggest some degree of bad character, defendant had rendered character evidence relevant by seeking to introduce evidence of his good character during cross-examination of prior witnesses. "A defendant who elicits character or reputation testimony opens the door to the prosecution's introduction of hearsay evidence that undermines testimony of his good reputation or of character inconsistent with the charged offense." (*People v. Tuggles* (2009) 179 Cal.App.4th 339, 357; see *People v. Mitcham* (1992) 1 Cal.4th 1027, 1072 ["By introducing evidence of good character, a defendant places his or her character in issue, thus opening the door to prosecution evidence tending to rebut that 'specific asserted aspect' of the defendant's character."].)

Here, prior to trial, defendant requested permission to call four character witnesses, and the trial court reserved ruling on that issue. However, during cross-examination of defendant's landlord, defense counsel sought to illicit testimony regarding whether she believed or heard defendant was a good father. Following this line of questioning, the trial court ruled on defendant's character evidence request; limited defendant to three character witnesses; and concluded that the questions directed to defendant's landlord regarding defendant's character as a good father were beyond the scope of permissible cross-examination, but that the testimony would be allowed as one of defendant's character witnesses.[6] Additionally, during cross-examination of M.A., defense counsel sought to elicit testimony regarding her prior statements to investigators

_____

[6] Defendant objected to the trial court's ruling in this regard but does not renew this objection on appeal.

14

that defendant was good at soothing Jane Doe; defendant was wonderful and had a lot of patience when dealing with Jane Doe; and defendant was a "good person." Thus, while the prosecutor did not explicitly seek to introduce the text messages as character evidence at the time, the trial court correctly concluded the text messages could be relevant for the purpose of disputing defendant's previously elicited testimony regarding his purported good character.

C. *The Text Messages Were Not Unduly Prejudicial*

Having concluded the trial court did not err in its determination that the text messages had probative value to disputed issues in this case, we further conclude the messages did not represent a risk of undue prejudice requiring their exclusion.

" ' " ' " ' "The 'prejudice' referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues. . . ." ' " ' " ' ' " ' "The prejudice that section 352 ' "is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence." [Citations.] "Rather, the statute uses the word in its etymological sense of 'prejudging' a person or cause on the basis of extraneous factors." ' " ' " ' " (*People v. Daveggio and Michaud* (2018) 4 Cal.5th 790, 824.) Evidence is unduly prejudicial " 'when it is of such nature as to inflame the emotions of the jury, motivating them to use the information, not to logically evaluate the point upon which it is relevant, but to reward or punish one side because of the jurors' emotional reaction. In such circumstance, the evidence is unduly prejudicial

15

because of the substantial likelihood the jury will use it for an illegitimate purpose.' " (*People v. Doolin* (2009) 45 Cal.4th 390, 439.)

Here, the content of the three text messages at issue is fairly innocuous. While the messages suggest defendant was not in a rush to get home after work, they do not suggest anything further. As the trial court noted, defendant's requests to "chill" with others did not suggest defendant was not on his way home, as they could equally be interpreted as asking those individuals to come over to his home to "chill." Further, as noted by defense counsel, there was nothing to suggest the distance between defendant's work and any other relevant location. Accordingly, the text message suggesting defendant was "right outside" someone else's home did not suggest he took any especially long detour from his normal route home, and it could equally have been interpreted or explained as a stop on the way home.

Ultimately, these text messages do not include any particularly inflammatory information.[7] The three messages do not reveal any particular aspect of defendant's

---

[7] To the extent defendant argues on appeal that the three messages admitted over his objection were inflammatory because the messages suggested he left Jane Doe at home alone, we find this argument unpersuasive. The messages at issue do not directly address whether Jane Doe was left at home alone. More importantly, by the time the trial court was asked to rule upon defendant's Evidence Code section 352 objection to these three messages, the fact Jane Doe had been left at home alone had already been established by other, more direct evidence to which defendant did not object. M.A. had already testified that Jane Doe had been left at home alone; defendant's brother had already denied defendant's claim that Jane Doe had been left in his care; and another text message in which defendant admitted leaving Jane Doe home alone had already been published to the jury without objection. In this context, the messages at issue in this appeal do not appear particularly prejudicial even if they suggested Jane Doe had been left home alone.

personality, background, or character that would pose a substantial likelihood the jury would use them for an illegitimate purpose. Because we conclude the text messages had probative value to disputed issues presented in the case and that the messages presented little or no risk of undue prejudice, we find no abuse of discretion in the trial court's decision to admit this evidence over defendant's objections, and we affirm the judgment. Further, because we find no abuse of discretion on the record before us, we need not address whether it was reasonably probable the jury might have reached a different verdict had the evidence been excluded.

### IV. DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

FIELDS
J.

We concur:

McKINSTER
Acting P. J.

MENETREZ
J.

17